IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **ALYSSA ESKER, Administrator of the Estate of EDWIN J. ESKER, Deceased,**<br><br>　　　　　　　　　Plaintiff,<br>　v.<br>**CHRISTOPHER LUTZ,**<br><br>　　　　　　　　　Defendant. | Case No. 19-cv-00691-SPM |

## MEMORANDUM AND ORDER

**McGLYNN, District Judge:**

Pending before the Court is a Motion for Summary Judgment (Doc. 24) filed by Defendant Christopher Lutz ("Lutz"). For the reason's set forth below, the Court **GRANTS** the Motion for Summary Judgment.

### PROCEDURAL HISTORY

On June 26, 2019, plaintiff Alyssa Esker ("Alyssa"), Administrator for the Estate of Edwin J. Esker ("Edwin"), deceased, filed her two-count complaint against Lutz, a police officer with the Monroe County Sheriff's Department, to redress the deprivation of rights secured by the Fourth, Fifth and Fourteenth Amendments to the U.S. Constitution (Doc. 1). The allegations in the complaint are predicated upon an incident that occurred on July 5, 2017 (*Id)*. Count I asserted the wrongful death of Edwin and Count II asserted survival claims for Edwin's next of kin, including Alyssa (*Id.)*.

In both counts, Alyssa asserts that Lutz was unjustified in using deadly force by discharging his service weapon, which resulted in the death of Edwin (Doc. 1, ¶ 9).

Specifically, Alyssa asserts that Lutz' actions deprived Edwin of the following rights under the U.S. Constitution: (a) Freedom from the use of excessive force; (b) Freedom from deprivation of liberty without due process of law; and, (c) Freedom from summary punishment and/or execution (Doc. 1, ¶ 10). Alyssa and her siblings further claim to have been deprived of Edwin's love, affection, companionship, society, guidance, and affection (Doc. 1, ¶ 14).

On September 10, 2019, Lutz filed his answer and affirmative defenses (Doc. 7). Lutz claimed that he was justified in the use of force (Doc. 7, ¶¶ I, II). Lutz further claimed that he was entitled to qualified immunity (Doc. 7, ¶ III).

On April 19, 2021, Lutz filed his motion for summary judgment, along with supporting memorandum of law, which included exhibits 1-6 (Docs. 24, 25). On May 24, 2021, Alyssa filed her responses to the motion and included exhibits 1-12 (Doc. 26). On June 7, 2021, Lutz filed his reply to plaintiffs' response to their motions for summary judgment. (Doc. 30). Lutz also manually filed the audio recording of the 911 telephone call that occurred on July 5, 2017 (Doc. 31).  On June 29, 2021, oral argument was held regarding this motion (Doc. 31).

## STATEMENT OF FACTS[1]

On July 5, 2017, Linda Esker ("Linda") called the Monroe County Sheriff's Department about her ex-husband, Edwin (Doc. 25, p. 4). Linda and Edwin were married in 1995 and divorced in 2013 (Doc. 25, p. 3). Linda lived at 1522 Mill Street in Maeystown; Edwin resided in an RV that he parked on the property (*Id.*). Edwin had a

---

[1] In an effort to exclude immaterial and irrelevant facts, this Court has prepared its own Statement of Facts based upon the briefs provided by the parties herein, as well as oral argument. Additionally, the Court has listened to the 911 audio recording provided by Lutz as well as reviewed the unofficial transcript of said recording provided by Alyssa.

drinking problem, and when he was angry, his eyes would get big and his jaw would get set (*Id.*).

Prior to calling the police, Linda had been at Walmart and then went to her son, Curtis Esker's house (*Id.*). Her son, Jake Esker, stopped by and advised her that Edwin was having issues, which she assumed meant he was drunk (*Id.*). He also told her to call the police (Doc. 25, p. 4). Her daughter, Alyssa, also called her and told her that Edwin had been in the house looking for ammunition for his hand gun while she was gone (*Id*).

When Linda returned home, Edwin was yelling and came to the door with a "sad zombie-like look on his face" (*Id.*). Since she had been warned about Edwin by both Jake and Alyssa, since she knew he had been looking for ammunition and since he mouthed, "I'm going to kill you" while at the door, she called the police (*Id.*). She told the 911 dispatcher that Edwin was at her door and that he threatened to kill her, and that she had armed herself with a baseball bat for self-defense (*Id*). She also told the dispatcher that Edwin had a chain saw that worked and he was headed toward the driveway with it (*Id.*). [2] While Linda was speaking with the 911 operator, the operator was simultaneously keeping the police informed of the situation.

Sergeant Christopher Lutz and Deputy Steve Meister were dispatched to the residence in Maeystown on a domestic call (Doc. 25, p. 7). Lutz has been with the Monroe County Sheriff's Department since February 2002 and Meister has been with the Monroe County Sheriff's Department since August 1995 (*Id;* Doc. 25, p. 9). The dispatcher told Lutz that there had been a disturbance, that Esker had made threats

---

[2] The Court notes that the chainsaw could be heard in the background of the recording of the 911 call. (Doc. 31).

and that Esker was yelling and screaming and drunk (*Id.*). Meister also was informed that Esker was screaming at his ex-wife (Linda), was banging on the door, had a chainsaw and threatened to kill her (Doc. 25, p. 10). Although Lutz was not in direct communication with Linda, he was aware of the ongoing 911 conversation and he provided advice regarding hiding in a safe place and being ready to defend herself with the baseball bat (Doc. 25, p. 8).

Prior to arriving at the Esker residence, Lutz turned off his siren and emergency lights to de-escalate the situation and not announce his arrival; however, he was in full uniform and driving a fully marked squad car (Doc. 25, p. 7). Lutz arrived at the address before Meister and pulled into the extremely steep driveway with a lot of potholes that caused him to slow down (*Id.*). As Lutz came around a 90-degree turn, he saw the top of a man's head through tall grass and stopped his vehicle (*Id.*). Believing it to be Esker, Lutz stopped his vehicle so he could talk to him (*Id.*). Lutz got out of his squad car and walked to the front of his vehicle (*Id.*). He saw Esker coming towards him with a clenched jaw and wide eyes and the chainsaw in his hands (*Id.*). It was very loud because Esker's right hand was on the throttle and his left was on the guide (Doc. 25, p. 9). Lutz drew his firearm and tried to get Esker to lower the chainsaw, but he continued forward and started to raise the chainsaw (*Id.*). Lutz feared for his safety and after giving a final verbal warning, fired off three (3) shots in quick succession[3] (*Id.*).

When Deputy Meister arrived, he saw a male, later identified as Esker, holding a running chainsaw in front of his chest and heard the chainsaw being revved (Doc. 25, p.

---

[3] The Court notes that 3 shots were heard in quick succession in the background of the 911 audio recording.

10). Meister saw Lutz backed up against the grill of his car and Esker walking towards Lutz at a fast pace with the chainsaw (*Id.*). Meister saw a red dot on Esker and began to draw his pistol because he thought it was Lutz's taser and he did not think it would thwart Esker's advances (*Id*). Meister heard Lutz's three gunshots in rapid succession, but did not see where the shots struck the man (*Id.*). Meister saw Esker go down after the third gunshot, and then Meister approached, retrieved the chainsaw, turned it off and moved it about 8 feet (*Id.*).

## LEGAL STANDARD

The court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Spurling v. C & M Fine Pack, Inc.*, 739 F.3d 1055 (7th Cir. 2014) (quoting Fed. R. Civ. P. 56(a)). Once the moving party has set forth the basis for summary judgment, the burden then shifts to the nonmoving party who must go beyond mere allegations and offer specific facts showing that there is a genuine issue of fact for trial. Fed. R. Civ. P. 56(e); s*ee Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). Stated another way, the nonmoving party must offer more than "[c]onclusory allegations, unsupported by specific facts," to establish a genuine issue of material fact. *Payne v. Pauley*, 337 F.3d 767 (7th Cir. 2003) *(*citing *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871 (1990)).

In determining whether a genuine issue of fact exists, the Court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion. *Bennington v. Caterpillar Inc.,* 275 F.3d 654 (7th Cir. 2001); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986). However, no issue remains for trial "unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that

party". *See Faas v. Sears, Roebuck & Co.*, 532 F.3d 633 (7th Cir. 2008). The nonmovant cannot simply rely on its pleadings; the nonmovant must present admissible evidence that sufficiently shows the existence of each element of its case on which it will bear the burden of proof at trial. *Midwest Imports, Ltd. v. Coval*, 71 F.3d 1311 (7th Cir. 1995) (*citing Serfecz v. Jewel Food Stores*, 67 F.3d 591 (7th Cir. 1995); *Greater Rockford Energy and Technology Corp. v. Shell Oil Co.,* 998 F.2d 391 (7th Cir. 1993)).

## ANALYSIS

In his motion for summary judgment, Lutz asserts that because are no questions of fact, he is entitled to the defense of qualified immunity (Doc. 25, p. 14). Specifically, he claims that he feared for his safety and the safety of others, so the use of deadly force was justified (*Id.*, pp. 16-17). He further claims that he is entitled to qualified immunity because he did not violate a "clearly established" law (*Id.*, pp. 17-18).

In her response, Alyssa argues that there is a genuine issue of material fact regarding the defense of qualified immunity (Doc. 26). Furthermore, Alyssa argues that Lutz violated her father's constitutional rights to be free from the use of excessive and unreasonable force and was not justified to do so (*Id*).

### I. LAW

#### A. Excessive Force

A police officer's use of deadly force constitutes a "seizure" within the meaning of the Fourth Amendment; and therefore, is constitutional only if is reasonable. *Tennessee v. Garner,* 471 U.S. 1, 11 (1985); *DeLuna v. City of Rockford, Ill.,* 447 F.3d 1008, 1010 (7th Cir. 2006). Reasonableness is not based on hindsight, but rather is determined considering the perspective of the officer on the scene, allowing "for the fact that police

officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham v. Connor,* 490 U.S. 386, 396–97 (1989); *Scott v. Edinburgh,* 346 F.3d 752, 756 (7th Cir. 2006). The focus is on whether the actions of the officer are objectively reasonable. *Id.* In other words, if an officer believes that the suspect's actions place him, or others in the immediate vicinity, in imminent danger of death or serious bodily injury, deadly force can reasonably be used. *Scott,* 346 F.3d at 756; *Muhammed v. City of Chicago,* 316 F.3d 680, 683 (7th Cir.2002).

Deadly force may be used if the officer has probable cause to believe that the armed suspect (1) "poses a threat of serious physical harm, either to the officer or to others," or (2) "committed a crime involving the infliction or threatened infliction of serious physical harm" and is about to escape. *Id.* at 11–12. Whenever possible under the circumstances, the officer should try to identify himself as a law enforcement officer to the suspect. *Id.; Sherrod v. Berry,* 856 F.2d 802, 805 (7th Cir.1988) (en banc). An officer's determination of the appropriate level of force to use must be measured from the "perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham v. Connor,* 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). What is important is the amount and quality of the information known to the officer at the time he fired the weapon when determining whether the officer used an appropriate level of force. *Sherrod,* 856 F.2d at 804–05. Thus, "when an officer believes that a suspect's actions [place] him, his partner, or those in the immediate vicinity in imminent danger of death or serious bodily injury, the officer can reasonably exercise the use of deadly force." *Id.* at 805 (emphasis omitted).

**B. Qualified Immunity**

Officers are also afforded the extra layer of protection of qualified immunity. *Thayer v. Chiczerski,* 705 F.3d 237, 247 (7th Cir. 2012). The doctrine of qualified immunity shields officers from civil liability so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). Qualified immunity balances two important interests, the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officers from harassment, distraction, and liability when they perform their duties reasonably. *Pearson,* 555 U.S. at 231.

Whether a reasonable officer could have believed his or her conduct was proper is a question of law for the court to determine. *Hunter v. Bryant,* 502 U.S. 224, 228 (1991). In analyzing a qualified immunity defense, the Court must determine: (1) whether a constitutional right would have been violated on the facts alleged, taken in the light most favorable to the party asserting the injury; and (2) whether that right was clearly established when viewed in the specific context of the case. *Saucier v. Katz,* 553 U.S. 194, 200-201 (2001). To overcome qualified immunity, a plaintiff "must show both (1) that the facts make out a constitutional violation, and (2) that the constitutional right was 'clearly established' at the time of the official's alleged misconduct." *Saucier,* 553 U.S. at 200-201; *Abbott v. Sangamon Cty., Ill.*, 705 F.3d 706, 713 (7th Cir. 2013). A clearly established right is one that is sufficiently clear that every reasonable official would have understood what he is doing violates that right. *Reichle v. Howards,* 566 U.S. 658, 659 (2012).

## II. DISCUSSION

### A. Constitutional Violation

The first inquiry under *Saucier v. Katz* is whether the facts as alleged constitute a civil rights violation. 553 U.S. 194, 200-201. Where an officer uses deadly force, that officer must have "probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others". *Garner,* 471 U.S. 1, 11.

As hereinbefore demonstrated, whether the officers' actions are "objectively reasonable" depends on the facts and circumstances confronting them, not the officers' underlying intent or motivation." *Graham,* 490 U.S. at 397. Moreover, the reasonableness calculation "must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham,* 490 U.S. at 396–7.

So what did Lutz know? He knew the following, which was being conveyed by the dispatcher: (1) Linda called 911 saying that Esker had been in her house looking for ammunition for his gun; (2) Esker had a firearm and maybe ammunition; (3) Esker threatened to kill Linda; (4) Esker was trying to gain entry into her home; (5) Esker was intoxicated and agitated; and, (6) Esker had a running chainsaw and was headed up the driveway. Given the facts known by Lutz, his belief that he could use deadly force is reasonable and justified.

Although a person has a constitutional right not to be shot, that right is not absolute and is inapplicable if an officer reasonably believes that he poses a threat to the officer or someone else. *Weinmann v. McClone,* 787 F.3d 444 (7th Cir. 2015). Because

Lutz reasonably feared for his life, the life of his partner, as well as lives of the Esker family members, his use of excessive force was justified and there was no constitutional violation that prohibited the defense of qualified immunity.

Although this should conclude the argument regarding qualified immunity as plaintiff is required to prove both prongs, this Court will continue the analysis.

### B. Clearly Established Right

The second prong is "especially important" in the complex and varying factual situations that occur in the excessive force context. *Mullenix,* 577 U.S. at 12. In establishing the second prong in the qualified immunity analysis, a plaintiff bears the burden of establishing that the constitutional right was "clearly established". *Ashcroft v. Al-Kidd,* 563 U.S. 731, 735 (2011).

A plaintiff can show that a right is "clearly established" by statute or constitution in at least two ways: (1) he can point to an analogous case establishing the right to be free from the conduct at issue; or (2) he can show that the conduct was "so egregious" that no reasonable person could have believed that it would not violate clearly established rights. *Smith v. City of Chicago,* 242 F.3d 737, 743 (7th Cir. 2001). The plaintiff does not have to point to a case directly on point, although "existing precedent must have placed the statutory or constitutional question beyond debate." *Doe v. Village of Arlington Heights,* 782 F.3d 911, 915 (7th Cir. 2015).

There is no analogous case regarding a suspect brandishing a chainsaw at police officers, so this case turns on the conduct itself. Indeed, even if factual circumstances are novel, a right can still be clearly established, so long as the state of the law at the time gave the defendants fair warning that their conduct was unconstitutional. *Hope v.*

*Pelzer,* 536 U.S. 730, 741 (2002). Put another way, the "contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton,* 483 U.S. 635, 640 (1987).

Was Lutz' conduct so egregious to violate his right to qualified immunity? No, because as set forth *infra*, he did not violate Esker's constitutional rights. Lutz was acting in defense of himself and defense of others.

Fourth amendment principals hold that a police officer may not seize an unarmed, non-dangerous suspect by shooting him dead, and that, when feasible, some warning should be given before the use of deadly force. See *Garner,* 471 U.S. at 11-12. The record is clear that Esker was not an unarmed, non-dangerous suspect – he was carrying a running chainsaw and he had threatened to kill his ex-wife, Linda. Moreover, Lutz testified (via deposition) that he drew his firearm and gave verbal warnings – this Court will not impose an additional burden that he must be certain the decedent heard the warnings over the running chainsaw.

Plaintiff's position is that Lutz shot Esker in the jaw, and then six seconds later shot him two more times in the chest in quick succession (Doc. 26, p. 12). Plaintiff argues that Lutz' conduct was in violation of clearly established law and was egregious because that first shot to the jaw would most likely have neutralized or incapacitated the perceived threat and Lutz should not have fired the second and third shots. Plaintiff further argued that the second shot was survivable, but that it would have incapacitated Esker. According to plaintiff, the third shot fired as a Coup de Grace, which was, in essence, an execution. However, this belies the 911 audio recording itself, wherein all three shots were heard in quick succession with no break in between.

Plaintiff contends that Lutz should have stopped to reassess the situation between the second and third shots fired, but there is no evidence that the threat was neutralized. When all shots are fired in one quick volley, as here, there is no affect on the qualified immunity analysis. *Plumhoff v. U.S.*, 572 U.S. 765, 777 (2014). Indeed, if police officers are justified in firing at a suspect to end a severe threat to public safety, the officers need not stop shooting until the threat has ended. *Id.* As the Supreme Court noted, had a second round of shots occurred after an initial round incapacitated decedent, it would be a different case, but there is no evidence that Lutz fired more than one round of shots, nor is there any evidence that Esker was incapacitated before the first round of shots ended. *See Plumhoff,* 572 U.S at 777.

Qualified immunity operates in this case, then, just as it does in others, to protect officers from the sometimes "hazy border between excessive and acceptable force". *Mullenix v. Luna,* 577 U.S. 7, 8 (2015). The qualified immunity standard "gives ample room for mistaken judgment" and protects "all but the plainly incompetent or those who knowingly violate the law". *Malley v. Briggs,* 475 U.S. 335, 341 (1986). This accommodation for reasonable error exists because officials should not always err on the side of caution because they fear being sued. *Davis v. Scherer,* 486 U.S. 183, 196 (1984).

Once the defense of qualified immunity is raised, "it becomes plaintiff's burden to defeat it." *Estate of Escobedo v. Martin*, 702 F.3d 388, 405 (7th Cir. 2012). Thus, plaintiff has the burden to show that Esker had clearly established rights that Lutz violated. *Id.* Because plaintiff has not and cannot satisfied this burden, Lutz is entitled to qualified immunity.

## CONCLUSION

For the reasons set forth above, the Court **GRANTS** the Motion for Summary Judgment filed by Defendant Christopher Lutz (Doc. 24). This action is **DISMISSED with prejudice** and the Clerk of Court is **DIRECTED** to enter judgment accordingly.

**IT IS SO ORDERED.**

**DATED:** July 27, 2021

/s/ Stephen P. McGlynn
**STEPHEN P. McGLYNN**
**U.S. District Judge**